# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

In re Gander Mountain Company
Securities Litigation

Civil No. 05-183 (DWF/AJB)

## <u>CLASS ACTION</u>

## MEMORANDUM
## OPINION AND ORDER

---

David J. Goldsmith, Esq., Ira A. Schochet, Esq., Labaton Sucharow & Rudoff LLP, Garrett D. Blanchfield, Jr., Esq., Brant D. Penney, Esq., Reinhardt Wendorf & Blanchfield, John K. Grant, Esq., Randall H. Steinmeyer, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Vernon J. Vander Weide, Esq., Head Seifert & Vander Weide, Sean M. Handler, Esq., Eric Lechtzin, Esq., Tamara Skvirsky, Esq., Marc A. Topaz, Esq., Richard A. Maniskas, Esq., Robin Winchester, Esq., Schiffrin & Barroway, LLP, counsel for Plaintiffs Donald Mueller, Jerry Olson, Arlene Olson, Richard Krueger, and William Duebel, on behalf of themselves and all other similarly situated Plaintiffs.

Ahna M. Thoresen, Esq., Wendy J. Wildung, Esq., Faegre & Benson LLP**,** Carolyn Glass Anderson, Esq., and Timothy J. Becker, Esq., Zimmerman Reed, PLLP, counsel for Defendants Gander Mountain Company; Mark R. Baker; Dennis M. Lindahl; Gerald A. Erickson; Donovan A. Erickson; Neal D. Erickson; Richard A. Erickson; Marjorie J. Pihl; and Ronald A. Erickson.

---

## Introduction

The above-entitled matter came before the undersigned United States District Court Judge on December 2, 2005, pursuant to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint"). In their Complaint, Plaintiffs Donald Mueller, Jerry Olson, Arlene Olson, Richard Krueger, and William Duebel (collectively "The Mueller Group"), on behalf of themselves and all other similarly situated Plaintiffs (collectively, the "Plaintiffs") allege securities fraud against Defendants in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and sections 11 and 15 of the Securities Act of

1933 (the "Securities Act").[1]  For the following reasons, Defendants' motion is granted.

## Background

Defendant Gander Mountain Company ("Gander Mountain"), a Minnesota corporation, is a retailer offering merchandise that caters to outdoor lifestyle enthusiasts.  In particular, Gander Mountain focuses on hunting, fishing, and camping merchandise.  Holiday Stationstores, Inc. ("Holiday"), acquired the existing Gander Mountain operations in 1996 and 1997.  Following the acquisition, Gander Mountain was transformed from a specialty store to a large format category-focused national chain store.  This transformation included building new large format stores with a warehouse-style environment.  From 1997 to 2004, Gander Mountain expanded its store base from 26 stores to 66 stores.

On February 5, 2004, Gander Mountain filed a registration statement ("the Registration Statement") for its initial public offering ("IPO").  On April 26, 2004, Gander Mountain closed its IPO, having raised over $105 million.  Gander Mountain used a portion of its IPO proceeds to repay a $9.8 million debt to Holiday.  Prior to Gander Mountain's initial public offering ("IPO"), Holiday, Lyndale Terminal Co. ("Lyndale"), and members of the Erickson Family owned all of Gander Mountain's voting

---

1       On January 28, 2005, a putative class action was filed against Gander Mountain and eight of its officers and directors.  After five other identical actions were filed, the cases were consolidated into the current action, naming The Mueller Group to serve as the lead plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B) and 15 U.S.C. § 77z-1(a)(3)(B).  On August 9, 2005, Plaintiffs filed the Complaint on behalf of all persons who purchased Gander Mountain securities pursuant to Gander Mountain's Registration Statement for its initial public offering and on behalf of all persons who purchased their shares in the open market between April 21, 2004, and January 14, 2005 (the "Class Period").

stock.[2]  Holiday and Lyndale are wholly owned by members of the Erickson Family.  Following the

IPO, the Erickson Defendants remained in control with 51% of Gander Mountain's outstanding

common stock.

Plaintiffs purchased Gander Mountain stock during the Class Period.  Plaintiffs' stock

subsequently decreased in value after Gander Mountain revealed disappointing earnings.  Gander

Mountain shares eventually dropped to $9.30, or 60% less than what the shares traded for at their all-

time high.  Plaintiffs then brought this securities fraud suit against Gander Mountain and eight of its

officers, directors, and former directors (the "Individual Defendants").  The Individual Defendants

include:  Chief Executive Officer Mark R. Baker ("Baker"); Chief Financial Officer Dennis M. Lindahl

("Lindahl"); Directors Gerald A. Erickson and Ronald A. Erickson; and former Directors Donovan A.

Erickson; Neal D. Erickson; Richard A. Erickson; and Marjorie J. Pihl.  Plaintiffs allege that Defendants

violated section 11 of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act

during the Class Period, by filing a misleading Registration Statement and issuing post-IPO misleading

statements about Gander Mountain's anticipated sales growth and income for 2004.

**Alleged False and Misleading Statements in the Registration Statement**

Plaintiffs posit that the introduction of a co-branded credit card program and an increase in

inventory drove comparable[3] store sales growth in fiscal year 2003.  Plaintiffs further assert that these

---

2      The Erickson Family includes Gerald A. Erickson, Ronald A. Erickson, Donovan A. Erickson, Neal D. Erickson, Richard A. Erickson, and Marjorie J. Pihl.

3      "Comparable" stores are stores that had been in operation for thirteen months or longer. (Complaint ¶ 82.)

strategies could not sustain growth long-term and that Plaintiffs knew these strategies were unsustainable in the long-term.  According to Plaintiffs, Gander Mountain neither sufficiently disclosed the reasons for the fiscal year 2003 comparable store sales growth, nor that its growth strategies would eventually fail. Based on this theory, Plaintiffs allege that the Registration Statement contains several false and defective statements.

The Complaint alleges that the Registration Statement compares fiscal year 2004 with fiscal year 2003 as follows:

> Sales increased by $132.0 million, or 36.9%, to $489.4 million in fiscal 2003 from $357.4 million in fiscal 2002.  The increase in sales resulted from a comparable store sales increase of $39.9 million, or 11.5%, and sales of $91.7 million from ten additional stores, including eight new stores and two relocated stores, opened during fiscal 2003. In addition to the operating initiatives discussed above, the increase in comparable store sales was attributable to sales increases in our hunting category led by consistently strong performance in our firearms department.  Firearms sales performance was enhanced by the launch of our co-branded credit card in September 2003, which provided customers with a 5% to 10% discount and a new financing option for these higher priced items.  These increases were partially offset by lower sales in the apparel and footwear categories due to unseasonably cool and wet weather in the first quarter of fiscal 2002 and flat sales of fishing rods and reels that were consistent with recent industry trends.

(Complaint ¶ 53.)

The Complaint also alleges that Gander Mountain represented that its financial statements were prepared in accordance with generally accepted accounting principles and reflected all adjustments necessary to present fairly Gander Mountain's results of operations.  (Complaint ¶ 54.)  With respect to pre-opening expenses, the Complaint alleges that Gander Mountain stated:

> Pre-opening expenses increased by $4.1 million to $4.7 million in fiscal 2003 from $0.6 million in fiscal 2002.  The increase in pre-opening expenses was due to the opening of eight new stores and two relocated stores, including eight larger format stores, during

fiscal 2003 compared to the opening of two new smaller format stores during fiscal 2002.

(Complaint ¶ 55.)

The Complaint asserts that the Registration Statement also represented that comparable store sales increased 11.5% for the 2003 fiscal year.  Additionally, the Complaint alleges that the Registration Statement contained the following data with respect to Gander Mountain's comparable store sales during the 2002 and 2003 fiscal years:

Fiscal 2002

|  | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr |
|---|---|---|---|---|
| Comparable store[] sales increase (decrease) | 1.9% | (1.9)% | (4.3)% | 12.0% |

Fiscal 2003

|  | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr |
|---|---|---|---|---|
| Comparable store[] sales increase (decrease) | 3.8% | 15.5% | 12.5% | 12.2% |

(Complaint ¶ 56.)

The Complaint alleges that the Registration Statement also contained a statement identifying the co-branded credit card promotion as part of Gander Mountain's marketing and advertising strategy as follows:  "In addition to our print advertising program, we incorporate the following into our marketing and advertising strategy: . . . a loyalty program offered through our co-branded MasterCard credit card.

 (Complaint ¶ 58.)

The Complaint asserts that the Registration Statement also included the following "risk factor":

> We incur significant additional expenses in the third and fourth fiscal quarters due to higher purchase volumes and increased staffing in our stores.  If, for any reason, we miscalculate the demand for our products or our product mix during the third or fourth fiscal quarters, our sales in these quarters could decline resulting in significantly lower margins and excess inventory, which could cause our annual operating results to suffer and our stock price to decline significantly.

(Complaint ¶ 59.)  Finally, the Complaint alleges that Gander Mountain indicated in the Registration Statement, "[w]e expect to grow at a rapid pace."  (Complaint ¶ 60.)

**Post-IPO Alleged False and Misleading Statements**

Plaintiffs also allege that several post-IPO press releases, quarterly reports, and conference calls issued and made during the Class Period contained false and misleading statements.  On May 19, 2004, Gander Mountain released its first quarter results for 2004.  (Complaint ¶ 92.)  A May 19 press release (the "First Quarter 2004 Earnings Release") showed a 42% increase in sales over the prior year and indicated that comparable store sales increased 8.7%.  The First Quarter 2004 Earnings Release estimated that sales would increase 33% to 43% over fiscal 2003.  The First Quarter 2004 Earnings Release also stated that comparable store sales are expected to increase by approximately 3% to 5% in 2004.  The First Quarter 2004 Earnings Release also estimated Gander Mountain's pre-tax income to be $16 to $21 million.  Plaintiffs cite the following paragraph from the First Quarter 2004 Earnings Release:

> "We were satisfied with Gander Mountain's progress in the quarter.  Strong sales growth reflects our emphasis on both comparable store performance and new store development," said Mark Baker, President and CEO.  "Gander Mountain is a highly-seasonal business both because of our hunting, fishing and camping emphasis and because of the concentration of our current stores in northern states.  First quarter results were consistent with our expectations and keep us on track to meet our overall

6

financial plan for 2004."

*(Id.)*

On June 14, 2004, Gander Mountain filed its quarterly report with the SEC for the period ended May 1, 2004 (the "First Quarter 2004 10-Q").  (Complaint ¶ 93.)  This report reiterated the financial results reported in Gander Mountain's First Quarter 2004 Earnings Report.  The First Quarter 2004 10-Q indicated that Gander Mountain's co-branded credit card program enhanced firearms sales.

On August 18, 2004, Gander Mountain issued a press release announcing its financial results for the quarter ended July 31, 2004 (the "Second Quarter 2004 Earnings Release").  (Complaint ¶ 97.)  In the Second Quarter 2004 Earnings Release, Gander Mountain stated that total sales increased 35% and that comparable store sales increased 1.8% for the quarter.  Baker commented, "Our industry leading 35% sales growth this quarter reflects our focus on both comparable store performance and new store development. . . .  We are on track to meet our overall financial plan for 2004 as we move into the higher volume third and fourth quarters."  *(Id.)*  Also on August 18, 2004, Defendants discussed Gander Mountain's second quarter 2004 financial results in a conference call with securities analysts (the "Second Quarter 2004 Earnings Conference Call").  (Complaint ¶ 98.)  Defendants affirmed Gander Mountain's comparable store sales growth in the Second Quarter 2004 Earnings Conference Call.

On September 30, 2004, Gander Mountain filed with the SEC its quarterly report for the period ended July 31, 2004 (the "Second Quarter 2004 10-Q").  (Complaint ¶ 100.)  The Second Quarter 2004 10-Q reiterated the financial results in Gander Mountain's Second Quarter 2004

Earnings Release.  The Second Quarter 2004 10-Q indicated that Gander Mountain's comparable store sales had increased by 1.8% during the second quarter of 2004.  The Second Quarter 2004 10-Q indicated that Gander Mountain's co-branded credit card program was partially responsible for increasing Gander Mountain's sales and gross profits.

A November 9, 2004, press release (the "November 9 Press Release") indicated that Gander Mountain revised its outlook for fiscal 2004.  (Complaint ¶ 105.)  The November 9 Press Release stated that Gander Mountain lowered its outlook for fiscal 2004 to a range of $8 to $13 million, compared with Gander Mountain's prior guidance of $16 to $21 million.  The November 9 Press Release also indicated that Gander Mountain expected its comparable store sales comparison for the year to be slightly negative.  The November 9 Press Release stated that Gander Mountain expected to report that total revenue in the third quarter increased 24%, reflecting the addition of new stores, while comparable store sales declined 7.5%.  The November 9 Press Release stated that in revising its outlook, Gander Mountain cited "weaker than-anticipated sales, resulting in part from the impact of unseasonably warm weather on sales of outerwear and footwear."  (*Id.*)  Additionally, Gander Mountain stated that "co-branded credit card promotions in 2004 were not as effective in driving sales of high-ticket items as the 2003 promotions, when the credit card program was introduced."  (*Id.*)  Plaintiffs also highlight Baker's statement that "[w]e are disappointed in the sales performance of our stores."  (*Id.*)

A November 17, 2004 press release (the "Third Quarter 2004 Earnings Release") indicated that Gander Mountain reported a 24.4% increase in total sales for the third quarter of fiscal 2004.  (Complaint ¶ 107.)  The Third Quarter 2004 Earnings Release indicated that comparable store sales

decreased 7.5%.  The Third Quarter 2004 Earnings Release indicated that Gander Mountain opened

14 stores in the quarter versus four in the third quarter of 2003, incurring pre-opening expenses of $4.6

million compared to $1.4 million in the 2003 period.  Baker stated in the Third Quarter 2004 Earnings

Release that "[w]hile we are disappointed in the slower-than expected growth in sales for the recent

quarter, we proactively managed our business to minimize the impact on profits."  (*Id.*)  The Third

Quarter 2004 Earnings Release indicated that sales for the full fiscal year 2004 were expected to

increase 31% to 37% over fiscal 2003.  The Third Quarter Earnings Release also indicated that

comparable store sales were expected to be negative 1% to 3%.

On November 17, 2004, Defendants conducted a conference call with securities analysts to

discuss Gander Mountain's financial results for the quarter that ended October 30, 2004 (the "Third

Quarter 2004 Earnings Conference Call").  (Complaint ¶ 108.)  During the Third Quarter 2004

Earnings Conference Call, Defendants reaffirmed the financial results reported in the Third Quarter

2004 Earnings Release.  Defendants stated that Gander Mountain's co-branded credit card promotion

was not as successful as in 2003 in increasing comparable store sales.

On January 14, 2005, Gander Mountain issued a press release (the "January Press Release")

that revised its pretax earnings for fiscal 2004 to a range of $2 to $4 million compared to Gander

Mountain's prior guidance of $8 to $13 million.  (Complaint ¶ 109.)  In the January Press Release,

Gander Mountain stated that it expected its sales growth to drop to a negative 2% to 3%.  The January

Press Release stated that in revising its outlook, Gander Mountain cited the continuing impact of

unseasonably warm weather into mid-December.  The January Press Release further indicated that

"[d]espite improvements in sales after the weather normalized, sales have not met [Gander Mountain's]

expectations." (*Id.*)  The January Press Release stated that as a result, Gander Mountain had increased post-holiday promotional activity in an effort to reduce inventories to comparable year-end levels and that these promotions would negatively impact the current quarter's gross margin rate.  (*Id.*)

**Allegations of Fraud**

Plaintiffs allege that "[i]n order to artificially boost comparable store sales, Baker masterminded a strategy to flood [Gander Mountain's] stores with inventory."  (Complaint ¶ 5.)  Further, Plaintiffs allege that these increased inventories were combined with 10 percent discounts offered to customers during the 2003 fiscal year, through Gander Mountain's co-branded credit card program.  According to Plaintiffs, these "short-term fixes had the desired effect of increasing comparable store sales by 11.5 percent in the 2003 fiscal year."  (*Id.*)  Plaintiffs contend that Defendants failed to sufficiently explain the primary source of those gains, and that the investing public was unaware that the sources were unsustainable.

Plaintiffs rely on former Gander Mountain employees as confidential sources to support their contention that Defendants engaged in a scheme to artificially inflate Gander Mountain's comparable store sales growth figures.  Plaintiffs' first confidential source, ("CS1"), was a former Divisional Merchandise Manager who worked at Gander Mountain's headquarters from 1998 to 2002.  CS1's supervisor was Allen Dittrich ("Dittrich"), Gander Mountain's Executive Vice President of Merchandizing and Marketing.  Dittrich reported to Baker.  "[B]ased upon conversations with [Gander Mountain's] senior management," CS1 claims that Baker attended weekly and monthly sales meetings during which senior management discussed sales strategies.  (Complaint ¶ 84.)  According to CS1, during these meetings Baker announced his plan to increase inventories and introduce the credit card

program.  CS1 described the strategy of increasing inventory as "an old trick in retail."  (Complaint ¶ 83.)  CS1 explained, "If you throw a lot of inventory at [stores], you can get exponential sales.  The more increased sales you get, the faster your comps grow."  (*Id.*)  CS1 also states "the problem with this strategy is that, although it yields short-term increases in sales, ultimately purchasing additional inventory becomes too expensive and cuts into profits."  (*Id.*)

Another confidential source, ("CS2"), was responsible for compiling weekly reports that provided updates on Gander Mountain's nationwide sales, inventory levels, gross margins, new store sales numbers and comparable store sales numbers.  According to CS2, all senior management, including Baker, had access to these reports.  A final confidential source, ("CS3"), indicates that sales information was also made available to Defendants through Gander Mountain's "point-of-sale" computer system.  According to CS3, Gander Mountain's computer system allowed Gander Mountain's executives to track every item sold and every item in inventory on a daily basis.

Plaintiffs contend that as a result of the weekly and monthly sales meetings, the weekly reports compiled by CS2, and the daily data tracking inventory, Defendants "knew about [Gander Mountain's] declining comparable store sales figures, the failure of the co-branded credit card promotion, rising inventories and declining profits at the time of the IPO."  (Complaint ¶ 87.)  Further, Plaintiffs contend that Defendants concealed the truth about Gander Mountain's "artificially inflated same store sales figures" from investors, resulting in a successful IPO.  (*Id.* at 88.)

**Disclosures of Risk**

Defendants assert that the Registration Statement discussed the risks associated with investing in Gander Mountain.  In particular, Defendants point to a section entitled "Risk Factors," that mentions the

11

following risks:  (1) "[o]ur current business strategy that focuses on larger format retail stores has not

been proven successful on a long-term basis and may negatively impact our operating results"; (2)

"[o]ur concentration of stores in the north central United States makes us susceptible to adverse

conditions in this region, including atypical weather"; (3) "[o]ur expansion into new, unfamiliar markets

presents increased risks that may prevent us from being profitable in these new markets"; (3) "[o]ur

expansion strategy includes further penetration of our existing markets, which could cause sales at our

existing stores to decline"; (4) "[t]he price of our common stock may be volatile."  (Defendants' Exhibit

List, Ex. A, Registration Statement ("Reg. St.") at 8–17.)

The Registration Statement also cautioned, "results for any particular quarter may not be

indicative of results to be expected for any other quarter or for a full fiscal year."  (Reg. St. at 32.)

Gander Mountain discussed its strategy of expanding its inventory in its Registration Statement,

indicating that its "broader and deeper assortment of merchandise" had "driven sales at new stores and

had a positive impact on comparable store sales in recent quarters."  (*Id.* at 27.)  Gander Mountain also

disclosed that it intended to continue increasing comparable store sales through "strengthening of

inventory positions."  (*Id.* at 41.)  Gander Mountain also discussed its co-branded credit card program,

stating that in fiscal year 2003, "[f]irearm sales performance was enhanced by the launch of our co-

branded credit card in September 2003, which provided customers with a 5% to 10% discount and a

new financing option for these higher priced items."  (*Id.* at 30.)

## Discussion

### I. Standard of Review

Generally speaking, in deciding a motion to dismiss, the Court must assume all facts in the complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). However, in the context of a case raising claims of securities fraud on behalf of a class, the Court must also consider the complaint in light of the heightened pleading standard established by the Private Securities Litigation Reform Act ("the Reform Act"), 15 U.S.C. §§ 78u-4 and 78u-5. Under 15 U.S.C. § 78u-4(b)(2), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." As such, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001). And, while a plaintiff is generally entitled, under Fed. R. Civ. P. 12(b)(6), to all reasonable inferences that may be drawn from the complaint, a claim of securities fraud can only survive if the allegations "collectively add up to a strong inference of the required state of mind." *Id.*

### II. Section 10(b) Claim

Plaintiffs allege that Defendants violated section 10(b) by making false and misleading statements and omissions in both the Registration Statement and in Gander Mountain's post-IPO press releases, quarterly reports, and conference calls. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

In order to bring a successful claim of securities fraud, a plaintiff must establish the following elements: (1) material misrepresentations or omissions; (2) made with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff relied; and (5) that proximately caused plaintiff's injuries. *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533–34 (8th Cir. 1996) (citing 17 C.F.R. § 240.10b-5 (2001)).

## A.      Claims under the Registration Statement

### 1.      Scienter

Defendants first contend that Plaintiffs have failed to plead facts, based on the Registration Statement, giving rise to a strong inference that Defendants acted with scienter. "Scienter" is "the intent to deceive, manipulate, or defraud." *Green Tree*, 270 F.3d at 653 (citations omitted). Scienter may be established by evidence of knowing or intentional practices to deceive, manipulate, or defraud. *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002) (citations omitted). Mere negligence or even gross negligence is not sufficient to establish scienter; however, a showing of recklessness may satisfy the scienter requirement. *Id.* In addition, allegations of unusual or heightened motive and

14

opportunity are sufficient to meet the Reform Act standard.  *Id.* at 894.

The issue of whether a particular intent existed is generally a question of fact for the jury. *K-Tel*, 300 F.3d at 894 (citing *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). Under Fed. R. Civ. P. 9(b), however, the complaint must provide a factual basis for the allegations of scienter.  In addition, plaintiffs must assert "concrete and personal benefit to the individual defendants" as a result of the fraud.  *K-Tel*, 300 F.3d at 894 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Defendants first contend that the Complaint fails to sufficiently allege that Defendants had an unusual or heightened motive to engage in fraud.  In particular, Defendants contend that Plaintiffs' alleged motives fail to support a reasonable inference of fraudulent intent because the alleged scheme was not in Defendants' economic self-interest.  Defendants claim that Plaintiffs' assertion that the Erickson Defendants wanted to "cash in on their huge investment" is nonsensical because none of the Erickson Defendants sold any of their stock during the Class Period.  (Complaint ¶ 4.)

Defendants also contend that Plaintiffs' claim that the Erickson Defendants were motivated by their desire to pay their $9.8 million debt to Holiday is unpersuasive.  Defendants assert that it would be economically irrational for the Erickson Defendants to engage in fraud to obtain $9.8 million when the Erickson family, together with Holiday, collectively own more than 51% of Gander Mountain's stock. Defendants contend that the decline in the price of Gander Mountain stock from its high point during the Class Period to the current stock price reduced the value of the Erickson Family's shares of Gander Mountain stock by over $110 million dollars.

Defendants also refute Plaintiffs' allegation that Baker and Lindahl were motivated to engage in

15

fraud to obtain stock options because there was no insider trading or lucrative stock sales during the Class Period. Defendants also refute Plaintiffs' allegation that Baker was motivated to engage in fraud so that he could receive a more lucrative employment contract. Defendants cite *K-Tel*, 300 F.3d at 895, for the proposition that general allegations about officer compensation are insufficient to create a strong inference of scienter. Additionally, Defendants assert that this motive theory is implausible because Baker did not receive a performance bonus in fiscal year 2004 because Gander Mountain did not perform as well as management had anticipated in 2004.

Defendants next assert that Plaintiffs do not allege any facts showing that the Defendants knew that statements in the Registration Statement were false or misleading. Defendants contend that the Complaint contains no particularized allegations that Defendants knew facts or had access to information suggesting that the Registration Statement was false or misleading, or that Gander Mountain's comparable store sales growth would falter in 2004.

Finally, Defendants assert that allegations made by CS1, CS2, and CS3 do not provide a strong reason to believe that Defendants engaged in recklessness or intentional conduct. First, Defendants cite *In re Cabletron Systems, Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002), and *In re Rural Cellular Corp. Sec. Litig.*, 2004 WL 1278725, at *2 (D. Minn. June 6, 2004) (quoting *Cabletron Systems*, 311 F.3d at 29–30.), for the proposition that the weight to be accorded information from confidential sources depends on "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Defendants further cite *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353–54 (5th Cir.

2002), for the proposition that information from a confidential source may be too vague or unreliable to be credited.  Based on these cases, Defendants assert that the information supplied by CS1, CS2, and CS3 should not be accorded any weight because it does nothing to support Plaintiffs' allegations of a fraudulent scheme.  Defendants assert that CS2's and CS3's claims are irrelevant because these confidential sources terminated their employment with Gander Mountain in 2002, before the Class Period.  Further, Defendants assert that the information provided by CS1—that Baker's strategy for increasing comparable store sales was to increase inventory—is not indicative of fraud because the Registration Statement makes clear that Gander Mountain's business strategy involved expanding its selling space and increasing its product offerings.

Plaintiffs counter that the Complaint raises a strong inference of scienter with respect to the alleged misleading disclosures in the Registration Statement.  Plaintiffs admit that most of their scienter allegations are supplied by CS1, CS2, and CS3, and contend that these allegations support a finding of reckless or intentional wrongdoing.[4]  Plaintiffs counter that, while CS2 and CS3 left their employment with Gander Mountain before the Class Period, they remained in close contact with management.

---

[4]     Plaintiffs also identified another confidential source, ("CS4"), after the Complaint was filed. CS4 asserts that the volume of inventory was "steady" to all stores, both existing and new.  (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Plaintiffs' Memorandum") at 12.)  In the event that the Court grants Defendants' Motion to Dismiss, Plaintiffs request leave to amend their Complaint pursuant to Fed. R. Civ. P. 15(a).  The Court denies Plaintiffs' request to amend, however, because CS4's claims do not allege a strong inference of scienter.  *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005) (holding that futility is a valid reason for a denial of a motion to amend).  While Plaintiffs allege that CS4 was a former Gander Mountain employee, Plaintiffs fail to disclose the dates of CS4's employment with Gander Mountain.  Thus, it is unclear whether CS4 had personal knowledge of facts from the Class Period. Regardless, CS4's vague claim does not support a strong inference of scienter.

Plaintiffs further contend that both CS2 and CS3 described information systems that had been implemented by the time they left Gander Mountain.

Additionally, Plaintiffs contend that Defendants had access to nonpublic information showing that increased comparable store sales were declining and inventory was rising.  Plaintiffs contend that "[i]n connection with" the meetings described by CS1, Baker and Lindahl were aware that comparable store sales were decreasing.

Finally, Plaintiffs assert that their motive and opportunity allegations support a strong inference of scienter.  Plaintiffs contend that "the overarching motive for Defendants' deceptive scheme was their need to bring [Gander Mountain] successfully through an IPO and into the public markets if Defendants were to have any realistic chance of reversing a downward trend in earnings and implementing their long-term (and costly) plan to open warehouse-style stores."  (Plaintiffs' Memorandum at 24.) According to Plaintiffs, Defendants intended to accomplish this goal by creating "the illusion" of increasing comparable store sales through increasing inventory and offering a credit card promotion. (*Id.*)  Further, Plaintiffs allege that Defendants knew that these strategies "entailed a material risk that profit margins would decline at some point."  (*Id.* at 25.)  Plaintiffs contend that Defendants' alleged fraud was not economically irrational because "it is reasonable to infer that Defendants had hoped that the large-format stores would begin to yield profits after the IPO sufficient to offset, at least in part, the inevitable declines in earnings caused by the flooding strategy."  (*Id.*)

The Court finds that Plaintiffs have failed to plead facts giving rise to a strong inference of scienter.  Moreover, the alleged misstatements in the Registration Statement, in light of the confidential sources' allegations, do not give rise to an inference of recklessness.  The Court agrees with Defendants

18

that information from confidential sources must be evaluated under the heightened pleading requirements of the Reform Act just like any other information in a complaint.  The Court finds that the information alleged by CS1, CS2, and CS3 is entitled to little weight because of the vague nature of the allegations and unreliability of the sources.  *See Cabletron Systems*, 311 F.3d at 29–30; *Rural Cellular*, 2004 WL 1278725, at \*2; *ABC Arbitrage*, 291 F.3d at 353–54.

Here, Plaintiffs admit that CS1 does not base his allegations on personal knowledge.  Rather, Plaintiffs claim that CS1 learned from Dittrich, who apparently attended meetings with Baker, that "Baker's strategy for increasing comparable store sales was to increase inventory."  (Complaint ¶ 7.)  Moreover, even if CS1 had attended meetings with Baker and had firsthand knowledge about strategies Baker implemented, CS1's allegation does not establish recklessness.  Even if Baker had a strategy to increase comparable store sales by increasing inventory, the Court does not find that such an allegation establishes recklessness.  While CS1 calls this strategy a "trick," he does not allege that Baker or any of the other Defendants believed that increasing inventory was a "trick" that would cause Gander Mountain's results in the second half of fiscal year 2004 to suffer.  Furthermore, the Registration Statement disclosed that Gander Mountain's business strategy involved expanding its selling space and increasing its product offerings.

CS2 and CS3 are also unreliable and offer only vague allegations.  These two confidential sources terminated their employment at Gander Mountain in 2002, long before the start of the Class Period.  Even assuming that CS2 and CS3 were reliable, their allegations do not establish recklessness.  The Complaint states that while CS2 worked for Gander Mountain, he compiled weekly reports that provided updates on Gander Mountain's nationwide sales, inventory levels, gross margins, new store

19

sales numbers, and comparable store sales numbers.  According to CS2, "nobody in the Company was more interested in reading these reports than Baker."  (Complaint ¶ 85.)  The Complaint also states that while CS3 worked for Gander Mountain, he worked with Gander Mountain's point-of-sale computer system that tracked sales and inventory on a daily basis.  CS3 states that Defendants had access to this information.  The information supplied by CS2 and CS3 is unremarkable and fails to allege that Defendants acted with recklessness or intentional wrongdoing.  The Court assumes that any executive would be interested in knowing such information about the company for which the executive works.

The Court also finds that Plaintiffs have failed to plead facts showing that Defendants had an unusual or heightened motive to engage in fraud.  The Court finds that Plaintiffs have failed to establish motive where none of the Erickson Defendants sold any of their stock during the Class Period and where the Erickson Defendants lost over $110 million in collective stock value during the Class Period.  Furthermore, the Court rejects Plaintiffs' assertion that the IPO conferred economic benefit on the Defendants when none of the Defendants sold their stock during the IPO.  Plaintiffs assert that "[t]o the extent Baker believed in [Gander Mountain's] long-term expansion strategy, it is reasonable to infer that Baker had hoped that the warehouse-style stores would begin to yield profits after the IPO sufficient to at least partially offset any earnings declines caused by the tail-end of the flooding strategy."  (Plaintiffs' Memorandum at 29.)  However, if Defendants believed that Gander Mountain's strategy would be successful and that Gander Mountain would achieve the results projected on May 19, 2004, then the projections could not have been made with scienter.

Finally, the Court finds that Plaintiffs have failed to plead facts showing Defendants knew facts or had access to information suggesting that their public statements were materially inaccurate.  In their

20

memorandum, Plaintiffs contend that CS1 states that Baker and Lindahl were aware, due to their attendance at sales and planning meetings, that before and at the time of the IPO, inventories were rising, but comparable store sales were declining.  However, the Complaint does not support the contention Plaintiffs make in their memorandum.  In the Complaint, CS1 merely asserts that Baker and Lindahl attended weekly sales and planning meetings and that it was during these meetings that Baker announced his plan to increase inventories and introduce a co-branded credit card promotion.  (*See* Complaint ¶ 84.)  Thus, these facts fail to establish that Defendants knew or had access to information suggesting that the Registration Statement was materially inaccurate.

### 2.      Actionable Omissions

Next, Defendants assert that the Complaint fails to plead actionable omissions in the Registration Statement.  Defendants contend that Gander Mountain disclosed that its 2003 sales were enhanced by an increase in inventories and by its co-branded credit card.  Plaintiffs contend that the Registration Statement misrepresented the nature and effect of the sources of Gander Mountain's comparable store sales growth for 2003.  The Court finds that Plaintiffs have not alleged sufficient facts to show actionable omissions.  Plaintiffs admit that the Registration Statement discloses its increases in inventory and credit card promotion.  The Court does not find that investors were misled because Defendants did not emphasize different facts or draw conclusions from the facts Gander Mountain did disclose.

### 3.      Materiality

Finally, Defendants assert that the alleged misstatements or omissions identified by the Plaintiffs fail to meet the test for materiality as a matter of law.  A misrepresentation or omission is material if there

is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). In many cases, the question of materiality is a factual question for a jury to decide. *Id.* In those cases where the alleged misrepresentation could not have swayed a reasonable investor, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial. *Id.* (citation omitted).

Defendants contend that the disclosures of risk included in the Registration Statement rendered any alleged misrepresentations immaterial as a matter of law, pursuant to the "bespeaks caution" doctrine. Under the "bespeaks caution" doctrine, "when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." *Parnes*, 122 F.3d at 548 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)).

In this case, the Court agrees with the Defendants that the risk disclosures included in the Registration Statement were sufficient to render the alleged misstatements immaterial as a matter of law. The Court rejects Plaintiffs' assertion that the doctrine is inapplicable because the alleged misstatements in the Registration Statement concern present or historical facts. Here, Plaintiffs have failed to plead facts showing that Defendants were aware of presently known facts regarding the significance of the increase in inventory and the credit card promotion on future comparable store sales. Further, Defendants' risk disclosures warned investors of potential risks that could occur in the future. The

Registration Statement indicated that Gander Mountain's comparable store sales and profit margins for fiscal 2004 might be less than in 2003.  The Registration Statement also cautioned that Gander Mountain's new business strategy had not been proven on a long-term basis, that it might not be successful in the new format stores, and that past results might not be indicative of future results.  Thus, the Court finds that Defendants' risk disclosures render immaterial as a matter of law Defendants' alleged failure to warn investors that Defendants' comparable store sales were unsustainable.

**B.      Claims Based on Post-IPO Alleged Misstatements**

Defendants also assert that Plaintiffs' claims based upon alleged misstatements in Gander Mountain's post-IPO press releases, quarterly reports, and conference calls should be dismissed. Defendants first assert that Plaintiffs' alleged misstatements cannot serve as the basis for a claim under the PSLRA's safe harbor for forward-looking statements.

Congress limited liability for forward-looking statements by providing a Safe Harbor provision to the Reform Act. 15 U.S.C. § 78u-5(c)(1) and (2).  Forward-looking statements are not actionable if they are identified and accompanied by risk disclosures, if they are immaterial, or if the Plaintiffs fail to prove that the person or persons making the statements made it with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u(c)(1)(A)(B).  The Safe Harbor provision "does not insulate statements that misrepresent historical/hard or current facts." *In re Ceridian Corp. Sec. Litig.*, Civ. No. 97-2044, 1999 U.S. Dist. LEXIS 15611, at *19 (D. Minn. Mar. 29, 1999) (citing *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997)).

Defendants assert the Complaint lacks facts showing actual knowledge of falsity on the part of any Defendant.  Defendants also assert that the forward-looking alleged misstatements were

accompanied by cautionary statements.  Plaintiffs counter that the alleged misstatements were historical financial facts at the time the statements were made, and thus were not forward-looking.  Plaintiffs further contend that none of the alleged misstatements were accompanied by cautionary language sufficient to render them immaterial as a matter of law.

The Court finds that the alleged misstatements were not historical financial facts, but rather projections.  The Court also finds that the Complaint lacks facts showing actual knowledge of falsity on the part of any Defendant.  Thus, on this basis, the alleged misstatements are not actionable.  Therefore, the Court does not need to reach the issue of whether the alleged misstatements were accompanied by cautionary language sufficient to render them immaterial as a matter of law.

Defendants next assert that Plaintiffs have failed to plead facts giving rise to a strong inference that the Defendants issued the May 19, 2004 projections with scienter.  The Court agrees.  As noted above, "scienter" is "the intent to deceive, manipulate, or defraud."  *Green Tree*, 270 F.3d at 653 (citations omitted).  Plaintiffs have not identified any rational economic reason for Defendants to issue false projections.  Further, Plaintiffs have failed to plead any facts showing that the Defendants actually knew that, as of May 19, 2004, their projections were doomed to failure.  Finally, any possible inference of scienter is negated by Gander Mountain's inter-quarter disclosures regarding its fiscal 2004 results.  Here, Gander Mountain revised its public guidance about 2004 results on November 9, 2004, and later on January 14, 2005, as soon as it was apparent to management that the projected numbers would not be achieved.   Thus, Plaintiffs have failed to plead facts giving rise to a strong inference that the Defendants issued the May 19, 2004 projections with scienter.

### III.    Section 11 Claims

Plaintiffs have alleged a claim of securities fraud under section 11 of the Exchange Act.  In order to establish a section 11 claim, Plaintiffs need only show that they "bought the security and that there was a material misstatement or omission."  *Romine v. Acxiom Corp.*, 296 F.3d 701, 704 (8th Cir. 2002) (quoting *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997)).  Once Plaintiffs have proven the two elements, the issuer's liability is "virtually absolute, even for most innocent misstatements."  *Romine*, 296 F.3d at 704 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Defendants contend that Plaintiffs have failed to identify any material misrepresentations or omissions in the Registration Statement.  Defendants contend that Plaintiffs have not alleged that any of the disclosures in the Registration Statement regarding the increased inventory and credit card program were false.  Further, Defendants cite *Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182, 1190 (11th Cir. 2002), for the proposition that material omissions in a Registration Statement are only actionable under section 11 if the defendants were under a duty to disclose the allegedly omitted information.  Defendants assert that Plaintiffs have not pleaded facts showing that Defendants had such a duty.  Defendants also contend that the "bespeaks caution" doctrine applies and defeats Plaintiffs' section 11 claim.  Finally, Defendants assert that Gander Mountain made all disclosures required by Regulation S-K.

Plaintiffs, on the other hand, contend that the Registration Statement misrepresented the nature and effect of the sources of Gander Mountain's comparable store sales growth for 2003.  Plaintiffs do not disagree with Defendants that omissions are inactionable absent a duty to disclose; however,

25

Plaintiffs assert that "a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." (Plaintiffs' Memorandum (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)).) Plaintiffs contend that Defendants' representations in the Registration Statement, as a whole, misled the reasonable investor. Plaintiffs admit that the Registration Statement referenced increases to inventory, but assert that Defendants failed to disclose the disproportionate effect of the inventory on comparable stores as opposed to newer warehouse-style stores. Additionally, Plaintiffs admit that the Registration Statement disclosed that the credit card program enhanced sales of firearms, but assert that this disclosure was misleading because there was no reference to the effect of the credit card's one-time incentive features.

The Court finds that Plaintiffs have not alleged sufficient facts to allow their section 11 claim to survive the motion to dismiss. Plaintiffs admit that the Registration Statement discloses its increases in inventory and credit card promotion. The Court does not find that investors were misled because Defendants did not emphasize different facts or draw conclusions from the facts it did disclose. The Court finds that Plaintiffs have failed to allege in the Complaint that Defendants knew, at the time the Registration Statement was issued, that it contained false information about the comparable store sales results and the factors generating those sales. Defendants were not obligated to provide conjecture about the future. There is no allegation in the Complaint that Defendants knew Gander Mountain would experience declines in comparable store sales figures in the future.

The Court also finds that Gander Mountain made all disclosures required by Regulation S-K. Item 303(a)(3)(ii) of Regulation S-K of the Securities Act requires that a registrant "describe any

26

known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). A disclosure duty exists under Regulation S-K when a trend or event is both (1) "presently known to management," and (2) "reasonably likely to have a material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (quoting Securities Act Release No. 6835 (May 18, 1989)).

Plaintiffs have failed to plead facts showing that increasing inventories in 2003 was a "trend" or "uncertainty" that Defendants knew would lead to a decline in profit margins by 2004. Here, Gander Mountain's inventory increased every year between 2000 and 2004. (Complaint ¶ 88.) In light of the fact that Gander Mountain was expanding its store base and focusing on new large format stores and increased product offerings, no facts in the Complaint indicate that this alleged trend would have a material effect on Gander Mountain's financial condition.

Additionally, Plaintiffs have failed to plead facts showing that the credit card promotion was a "trend" or "uncertainty" that Defendants knew was reasonably likely to have material effects on Gander Mountain's financial condition. Defendants correctly assert that the facts in the Complaint contradict Plaintiff's assertion that Gander Mountain's comparable store sales gains in 2003 were primarily driven by the credit card program. The credit card program was not introduced until September 2003, following Gander Mountain's comparable store sales gains of 15.5% in the second quarter of that year. (Complaint ¶¶ 56, 57.) Finally, the Court finds that the "bespeaks caution" doctrine defeats Plaintiffs' section 11 claim as discussed above.

**IV.      Claims Against the Individual Defendants**

Plaintiff' make the same allegations against the Individual Defendants as Plaintiffs make against

Gander Mountain.  Because Plaintiffs' allegations fail against Gander Mountain as a matter of law, the

allegations are also insufficient against the Individual Defendants.  Additionally, Plaintiffs also allege

claims against the Individual Defendants for violations of section 20(a) of the Securities Exchange Act

and section 15 of the Securities Act.  Because Plaintiffs have not properly pleaded a section 10(b) claim

or a section 11 claim, their section 20(a) and section 15 claims must be dismissed as well.  *See Parnes*,

122 F.3d at 550 n.12.

**Conclusion**

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Defendants' Motion to Dismiss the Consolidated Class Action Complaint (Doc. No.

35) is **GRANTED**.

2.      The Consolidated Class Action Complaint (Doc. No. 33) is **DISMISSED WITH**

**PREJUDICE IN ITS ENTIRETY**.

      **LET JUDGEMENT BE ENTERED ACCORDINGLY**.

Dated:  January 17, 2006                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court